UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**George CAMPOS, et al.**                                                 **PLAINTIFFS**

**v.**                                          **CIVIL ACTION NO. 3:18-CV-196-CRS**

**LOUISVILLE METRO POLICE**
**OFFICERS CREDIT UNION, and**
**Josephine CROWE**                                                   **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

**I.**      **Introduction**

This case is before the Court on Defendant Louisville Metro Police Officers Credit Union's (LMPOCU) motion to dismiss. DN 4. Plaintiffs George and Heather Campos filed this lawsuit in Jefferson County Circuit Court, claiming that Defendant Josephine Crowe mismanaged and misappropriated client funds, giving rise to numerous state and federal law claims against her and her employer, LMPOCU. DN 1-2 at 5. LMPOCU timely removed the case to this Court. DN 1 at 1. Once here, it filed a motion to dismiss, claiming, *inter alia*, a lack of duty, a lack of injury, lack of a sufficient legal basis, and that *respondeat superior* does not apply. DN 4. The Camposes responded (DN 5) and LMPOCU replied (DN 6). Afterward, the Camposes filed a motion to amend their complaint. DN 7. LMPOCU responded in opposition (DN 9) and the Camposes replied (DN 10). This matter is now ripe for review. For the following reasons, the Court will grant the Camposes motion to amend, deny LMPOCU's motion to dismiss in part, and grant LMPOCU's motion to dismiss in part.

## II. Factual Background and Procedural History

### A. Defendant Louisville Metro Police Officers Credit Union

LMPOCU was founded in 1942 and incorporated under the laws of the Commonwealth of Kentucky as a cooperative, nonprofit association. DN 7-1 at 7.[1] It was overseen by the Kentucky Department of Financial Institutions and the National Credit Union Administration (NCUA). *Id.* at 2. Members of LMPOCU were primarily law enforcement personnel and their families. *Id.* at 7. It served over 3,500 members and businesses in the Louisville, Kentucky area and held over $28 million in assets. *Id.*

LMPOCU was placed into conservatorship on December 17, 2017. *Id.* at 11. At the time of briefing, NCUA had not made a decision regarding the long-term future of LMPOCU. *Id.* However, it appears that LMPOCU has been liquidated and sold to Commonwealth Credit Union. Press Release, National Credit Union Administration, Louisville Metro Police Officers Credit Union Closes; Commonwealth Credit Union Assumes Members, Shares, and Loans (June 29, 2018), available at https://bit.ly/2Q7V8HH. This decision was made "after determining the credit union was insolvent and had no prospect for restoring viable operations." *Id.*

### B. Defendant Josephine Crowe

Plaintiffs allege that, prior to joining LMPOCU, Josephine Crowe had filed for bankruptcy twice, had thousands of dollars seized by the IRS, had a house in foreclosure, had federal and state tax liens on her, had numerous judgment liens against her, had numerous debts in collection, voluntarily surrendered a vehicle to avoid repossession, and had a civil judgment entered against her by another credit union. *Id.* at 9. After her hiring, Crowe's alleged financial

---

[1] Because the Court, *infra*, grants the Camposes motion to amend, the facts and claims are presented here as they are presented in the First Amended Complaint (DN 7-1).

troubles persisted, as she ultimately had her house foreclosed on, had numerous other tax liens filed against her, and had one or more collection actions filed in court. *Id.* at 9.

While she was employed at LMPOCU, Crowe allegedly began unlawfully accessing member information and using other employees' login information to establish or set up fictitious loans in members' names, divert members' electronic transfers to other accounts, and prevent payments from being made on members' loans. *Id.* at 11. The resulting inaccuracies in members' financial records were reported by LMPOCU to the various credit reporting agencies. *Id.* All of this conduct, Plaintiffs claim, was in the course of her employment, carried out with the apparent authority to conduct such business, and at least partly to further LMPOCU's business. *Id.* at 8.

### C. The Investigation

At some point, LMPOCU retained a certified public accountant to conduct an audit and reconciliation of LMPOCU's records. *Id.* at 10. As part of that process, LMPOCU posted an announcement on its website notifying Members that it was conducting a statement verification for the preceding quarter. *Id.* at 9. LMPOCU told members that, unless errors were reported within ten days, LMPOCU would assume the records were accurate. *Id.* at 10. During the investigation, Crowe remained in her position as Vice President but was, at some point, suspended. *Id.*

Next, law enforcement and regulatory agencies became involved. In November 2017, the Louisville Metro Police Department began investigating possible financial crimes involving LMPOCU. *Id.* The Federal Bureau of Investigation quickly took over. *Id.* Shortly thereafter, the Kentucky Department of Financial Institutions opened a separate investigation and placed LMPOCU into conservatorship. *Id.* During its investigation as conservator, the NCUA found that

3

LMPOCU had a "lack of oversight" and "records that do not add up." *Id.* at 11–12. They found "loans taken out [and] loans existing on vehicles already sold" and employee actions meant to conceal and hide "jaw dropping stuff." *Id.* at 12. Ultimately, they concluded that it was "convoluted, done to conceal, hide money, and to play games." *Id.* As to Crowe, NCUA concluded that she "should never have been there." *Id.*

### D. The Plaintiffs

#### i. George and Heather Campos

George and Heather Campos discovered fictitious loans in their names, loans that showed balances owed despite having been paid off, and loans that were not being paid in accordance with their instructions. DN 7-1 at 12–13. They also discovered a number of unauthorized personal charges on their credit cards. *Id.* at 16. As a result, negative information was reported to credit reporting agencies about the Camposes. *Id.*

When they approached LMPOCU with these issues, the receptionist asked "are you here about the Josie [Crowe] thing?" before sending them to Cole McCollum, the Vice President and Compliance Officer for LMPOCU. *Id.* at 15. McCollum stated that LMPOCU was doing everything it could to resolve the problems. *Id.* The Camposes requested a copy of the loan documents from McCollum, who declined to produce those materials because "too much of the file was missing." *Id.* at 17. Afterward, the Camposes received phone calls from LMPOCU regarding paperwork for a car that they no longer owned and an overdue credit card whose balance was in dispute. *Id.* A month later, Campos requested a full accounting of direct deposits made, loan payments made, loan payoffs, and all negative credit history reports. *Id.* NCUA, acting as conservator, refused this request. *Id.* at 18.

### ii. Jason DuCre

Jason DuCre purchased a 2011 Jeep with a $28,500 loan from LMPOCU. *Id*. He never signed any paperwork but understood the basic terms and agreed on a payment plan. *Id*. In late 2017, he received notice that a payment was late on "one of" his car loans. *Id*. In investigating, he found a fictitious loan in his name for a 2016 Jeep that he did not own. *Id*. DuCre signed an affidavit that the loan was fictitious and was told by McCollum that he would "straighten everything out." *Id*. At that point, LMPOCU began making a series of unusual withdrawals from DuCre's account—over $1,500 in a three-week period. *Id*. Despite the withdrawals, DuCre received a notice that his loan payment was late. *Id*. at 19. LMPOCU established a payment plan for DuCre to pay off the Jeep that would have variable payments. *Id*. Tiring of the repayment plan, DuCre attempted to refinance, but was told by LMPOCU that the payoff amount was $28,900—$400 more than the principal of the loan. *Id*. He was told the increase was due to late fees. *Id*. At the time, DuCre was planning to purchase a home with his wife. *Id*. However, due to the negative credit reporting, they were forced to finance the home through his wife's credit alone. *Id*.

### iii. Terry Garvin, Sr.

Crowe allegedly told Terry Garvin, Sr. that he "needed to come up with" $10,000 or he would be "put on a list" to have his property repossessed. *Id*. at 19–20. Garvin then obtained a loan in his son's name so he could pay it. *Id*. at 20. Afterward, he discovered that LMPOCU's records showed 23 fictitious loans in his name, that there had been numerous unauthorized cash advances on his credit card, that his credit cards were maxed out, and that there were transactions in his account history that he did not recognize. *Id*.

### iv. Michael Kuzma

LMPOCU's records show a loan for a car in Kuzma's name. *Id*. Those records indicate that Crowe originated and processed the loan. *Id*. However, Kuzma never applied for or agreed to be the debtor on the loan. *Id*. Instead, to the extent the loan should have existed, it should have been in his wife's name. *Id*. Kuzma brought his concerns to McCollum and demanded to see the loan records. *Id.* McCollum told him that LMPOCU had no records for the car loan and that the Kuzmas would have to come back to redo the paperwork. *Id*. at 20–21.

Kuzma also purchased two work trucks for $20,000 financed by a loan from LMPOCU. *Id*. at 21. Those loans, also originated and processed by Crowe, now indicate a total balance due of $60,000—three times the principal. *Id.* McCollum refused to provide any information on the loans, since they "were in dispute." *Id*. Kuzma is also in the process of purchasing a home and has also found that the credit reporting of LMPOCU has affected his ability to obtain financing. *Id*.

### v. The Putative Class

Plaintiffs have also sought to bring a class action against LMPOCU. The putative class members include:

> All Members of LMPOCU who purchased or otherwise utilized LMPOCU's services for personal, family, or household purposes, and who: (1) had fictitious loans obtained in their names; (2) had automatic periodic electronic transfers or other funds diverted to other accounts or otherwise stolen; (3) had fictitious loans obtained in their names, using their property as collateral; or (4) who had false, inaccurate, or incomplete information appear on their credit report as the result of the above-stated actions.

*Id.* at 24. As of yet, there has been no motion to certify the class.

### E. The Present Suit

The Camposes originally filed their class action complaint in the Jefferson County Circuit Court. DN 1-2 at 3. In it, they alleged eleven claims. The first nine counts deal with state law,

including (1) breach of fiduciary duty, (2) fraud, (3) fraudulent omission, (4) conversion, (5) breach of the duty of good faith and fair dealing, (6) negligent hiring, retention, and supervision, (7) negligence per se, (8) breach of contract, and (9) violations of the Kentucky Consumer Protection Act, KRS § 367.170, *et seq.* DN 1-3 at 5. The remaining two counts deal with federal law, including violations of (10) the Electronic Funds Transfer Act, 15 U.S.C. §1693, *et seq.*, and (11) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. *Id.* at 5.

LMPOCU filed a notice of removal on March 28, 2018, citing this Court's federal question jurisdiction. DN 1 at 2. Since then, LMPOCU filed a motion to dismiss (DN 4) and the Camposes filed a motion to amend their complaint (DN 7). Both motions are ripe.

### III.   Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint need not contain "detailed factual allegations," yet must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dept. of Child Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

"[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citations omitted). "The defendant has the burden of showing

that the plaintiff has failed to state a claim for relief[.]" *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

IV. **Discussion**

Motions to amend and motions to dismiss are often, as is the case here, interrelated. The motion to dismiss was made to test the Camposes' complaint, and now the Camposes' motion to amend seeks to address deficiencies in the original complaint, real or perceived, brought out by LMPOCU's motion to dismiss.

A. **Camposes' Motion to Amend**

A party may amend its pleading once as a matter of course within 21 days after serving it or, if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1). In all other cases, "the opposing party's written consent or the court's leave" is required. Fed. R. Civ. P. 15(a)(2). However, "[t]he court should feely give leave when justice so requires." *Id.* Ultimately, the purpose of Rule 15(a) is "to reinforce the principle that cases 'should be tried on their merits rather than the technicalities of pleadings.'" *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986) (quoting *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982)). In opposing the motion to amend, LMPOCU argues that the amendment would result in improper joinder and would be futile. The Court addresses each argument in turn.

i. **Improper Joinder**

LMPOCU argues that "each of the proposed plaintiffs was subject to a distinct series of events and alleged wrongs." DN 9 at 3. As a result, it argues, the proposed plaintiffs do not meet the joinder requirements of Rule 20, could confuse the issues, and prejudice LMPOCU. *Id.* The Camposes counter that LMPOCU's objections are premature and, regardless, that joinder is

proper because all of the proposed plaintiffs injuries arose from the same events—the alleged theft by Crowe and the actions or inactions of LMPOCU. DN 10 at 5–6.

Federal Rule of Civil Procedure 20(a)(1) states that "[p]ersons may join in one action as plaintiffs if (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." LMPOCU attacks only the first of these two requirements.

"The purpose of Rule 20(a) is to promote judicial economy and trial convenience." *Eaves-Leanos v. Assurant, Inc.*, 3:07-CV-18-S, 2008 U.S. Dist. LEXIS 1384, at *5 (W.D. Ky. Jan. 7, 2008) (citing *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir. 1974)). "It is governed by the principle to allow 'the broadest possible scope of action consistent with fairness to the parties.'" *Id.* (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966)).

In determining whether claims fall within the same transaction or occurrence, the courts utilize a case-by-case approach. *Mosley*, 497 F.2d at 1333 (citing 7 Charles A. Wright, FEDERAL PRACTICE AND PROCEDURE § 1653 (1972)). There are "[n]o hard and fast rules." *Id.* "'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Id.* (citing *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)). As a result, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Id.* (citing Wright, *supra*).

Here, all Plaintiffs were victims of the same alleged actions and inactions by Defendants. They had fictitious loans obtained in their names, had payments misapplied, and had negative

9

information reported on their credit histories. Without further evidence as to the dissimilarity of the Plaintiffs claims, the Court declines to adopt the restrictive view of joinder advanced by LMPOCU.

> ii. **Futility**

LMPOCU also argues that "Plaintiffs' proposed Amended Complaint still fails to allege any 'facts' to invoke the doctrine of *respondeat superior* in this matter." DN 9 at 1. The mere insertion of a statement regarding Crowe's activities, they argue, is insufficient to meet the well-pleaded complaint requirement. *Id.* at 2. Further, it argues, the addition of another Kentucky law claim would be futile because, if the motion to dismiss is granted as to the federal issues, the remaining state law claims should be dismissed. *Id.* at 3 (citing *Gibbs*, 383 U.S. at 726). The Camposes rebut the claims of futility by asserting that the facts in the amended complaint are sufficient to state a claim and that the state law claims could be litigated by this Court even if the federal claims were dismissed. DN 10 at 2–3.

It is clear that, "[w]hen a district court denies a motion to amend because it concludes that the amendment would be futile, the basis for its denial of the motion is its purely legal conclusion that the proposed amendment count not withstand a Rule 12(b)(6) motion to dismiss." *Nollner v. S. Baptist Convention*, 628 F. App'x 944, 947–48 (6th Cir. 2015). To satisfy that standard, the Court must then determine whether the amended complaint would survive a 12(b)(6) motion. In the context where, as here, there are pending motions to dismiss and to amend, such an inquiry "effectively grants the motion to amend." *Rickett v. Smith*, 1:14-CV-70-GNS, 2015 WL 3580500, at *1, n. 1 (W.D. Ky. June 5, 2015). It is simply more efficient to grant the motion to amend and then consider whether the amended complaint can survive the pending motion to dismiss. *Id.* at *3. The arguments made in the briefs surrounding the motion to amend,

including the additional support for both parties, will be considered in conjunction with the motion to dismiss. "This consideration should prevent any prejudice." *Id.* at *1, n. 1. Therefore, the Camposes motion to amend (DN 7) is granted.

### B. LMPOCU's Motion to Dismiss

LMPOCU attacks each count of the Camposes complaint individually. However, some of its arguments fall into broader categories across counts. We address the generalized claims first, followed by the more specific ones.

#### i. Injury

Throughout its motion to dismiss (counts 1, 2, 3, 4, 6, 9, and 11) LMPOCU argues that "Plaintiffs were afforded the opportunity, prior to the filing of this lawsuit, to dispute false loans, and Plaintiffs have worked together with the Credit Union to monitor and remedy, where necessary, any perceived inaccuracies in Plaintiffs' banking accounts and records and credit history." DN 4-1 at 3. As a result, LMPOCU contends there has been no injury.

Plaintiffs' complaint details fictitious, delinquent loans, electronic transfers diverted from paying off legitimate loans, inflated outstanding loan balances, inaccurate and negative information reported to credit reporting agencies, and unauthorized charges on a credit card. DN 7-1 at 1–2. Nothing in the record indicates that LMPOCU removed those fictitious loans from its database, determined amounts diverted from Plaintiffs' electronic transfers, determined amounts improperly charged to Plaintiffs' credit cards, credited legitimate payments, or removed negative information reported to credit reporting agencies. Taking the Plaintiffs' asserted facts as true, the Plaintiffs experienced and continue to experience injury from Defendants' actions. As a result, Plaintiffs have plausibly alleged injuries on which relief can be granted.

### ii. Vicarious Liability

Under counts 7 (negligence *per se* based on Kentucky statute), 8 (negligence *per se* based on Kentucky regulations), 10 (Kentucky Consumer Protection Act), and 12 (Computer Fraud and Abuse Act),[2] LMPOCU argues that it cannot be liable for Crowe's alleged actions. DN 4-1 at 6–9. Plaintiffs argue that LMPOCU is liable for her actions under theories of *respondeat superior* and apparent authority. DN 5 at 8–13.

All parties seem to agree that when "an employee acts from purely personal motives . . . which [are] in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable." *Ten Broeck Dupont, Inc v. Brooks*, 283 S.W.3d 705, 732 (Ky. 2009). However, when an employee's actions were motivated by furthering the employer's business, an employer is liable, even if the actions were unauthorized or expressly prohibited. *Patterson v. Blair*, 172 S.W.3d 361, 366–67 (Ky. 2005). As such, the issue of vicarious liability turns solely on Crowe's motives while committing the alleged actions.

Plaintiffs allege that Crowe made loans, recruited members, accepted payments on loans, and established repayment plans for members. DN 7-1 at 8. All of these acts would be within the ordinary functions of a credit union and within Crowe's job duties. From those alleged actions, LMPOCU profited, generating revenue from the interests and fees. DN 5 at 17. Further demonstrating her alignment with LMPOCU, Crowe spent time in a management position as Vice President. DN 7-1 at 8. Under those facts, Plaintiffs have stated a plausible claim that

---

[2] "As to vicarious liability, courts have held that an employer can be vicariously liable for an employee's violations of the CFAA if those transgressions occur in the scope of employment or the employer directs the employee's conduct." *NetApp, Inc. v. Nimble Storage, Inc.*, 14 F. Supp. 3d 816 (N.D. Cal. 2014). *See also SBM Site Servs., LLC v. Garrett*, 10-CV-385-WJM, 2012 WL 628619, at *6 (D.Colo. Feb. 27, 2012) ("It is reasonable to infer that Garrett accessed SBM's laptop during the time that he was employed with Able and in the scope of such employment."); *Charles Schwab & Co. v. Carter*, 04 C 7071, 2005 WL 2369815, at *6 (N.D. Ill. Sept. 27, 2005) ("the Court assumes that Congress drafted the CFAA with an intent to permit vicarious liability").

Crowe was motivated by furthering LMPOCU's business and that LMPOCU could be held vicariously liable.

### iii. Negligent Hiring, Retention, and Supervision

Under count 6, LMPOCU argues that Plaintiffs have failed to allege the existence of any duty or injury and, as a result, cannot demonstrate negligence. DN 4-1 at 5. Plaintiffs counter that the proper inquiry is whether LMPOCU negligently hired or supervised its employees. DN 5 at 13–15. As discussed in II, *supra*, the Plaintiffs have alleged a plausible injury. Therefore, the Court addresses only the proper standard for negligent hiring, retention, and supervision.

"[A] person conducting an activity through agents is independently subject to liability for harm resulting from his own conduct if he is negligent or reckless in supervising his agents." *MV Transportation, Inc. v. Allgeier*, 433 S.W.3d 324, 336 (Ky. 2014) (citing RESTATEMENT (SECOND) OF AGENCY § 213 (AM. LAW. INST. 1958)). As such, "the employer may be liable both on the ground that he was personally negligent and on the ground that the conduct was within the scope of employment." *Id.* To state a claim for negligent hiring, retention, or supervision, a plaintiff "must allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005) (citing 17 AM. JUR. 2D *Employment Relationships* § 401 (2004)).

The complaint alleges that LMPOCU knew or should have known of Crowe's alleged history of poor financial management, that it failed to disclose that information to members, and that it retained Crowe despite ongoing investigations. DN 7-1 at 3–4. During that time, Crowe's

alleged actions and inactions further injured Plaintiffs. Therefore, Plaintiffs allege a plausible claim for negligent hiring, retention, and supervision.

### iv. Kentucky Consumer Protection Act

Under count 10, Plaintiffs allege violations of the Kentucky Consumer Protection Act. LMPOCU argues that the Plaintiffs must demonstrate intentional or grossly negligent conduct, while in their pleadings, they admit that LMPOCU is, at most, "negligent." DN 4-1 at 7 (citing *Capitol Cadillac Old, Inc. v. Roberts*, 813 S.W.2d 287, 291 (Ky. 1991)). Plaintiffs assert that Crowe's alleged actions were undertaken with the requisite scienter and that LMPOCU is vicariously liable for the reasons discussed, *supra*, in (i). DN 5 at 15–17.

The act provides that "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." KRS § 367.170(1). It defines trade and commerce as "the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth." KRS § 367.110(2). "The statute . . . does not apply to simple incompetent performance of contractual duties unless some element of intentional or grossly negligent conduct is also present." *Capitol Cadillac*, 813 S.W.2d at 291 (citing *Dare to Be Great, Inc. v. Com.,* ex rel. *Hancock*, 511 S.W.2d 224 (Ky. 1974)). The complaint must "show substantial wrongs committed against a clearly protected interest and rights" rather than merely "bad manners or mere breakdowns in communications resulting in irritations injuring pride." *Id.* (quoting *Feathers v. State Farm Fire and Casualty Co.*, 667 S.W.2d 693, 696 (Ky. Ct. App. 1983)).

Taking Plaintiffs' asserted facts as true, it is clear that Crowe's acts would be intentional or grossly negligent. It is true that Plaintiffs alleged, in another count, that LMPOCU was negligent in its hiring, retention, and supervision of Crowe. However, that does not preclude vicarious liability for LMPOCU based on Crowe's alleged conduct under this count. Therefore, Plaintiffs state a claim under the Kentucky Consumer Protection Act.

      v.      **Breach of Fiduciary Duty**

LMPOCU argues that Plaintiffs do not state a claim because a fiduciary duty does not exist and there is no injury. DN 4-1 at 2–3. As discussed in II, *supra*, the Plaintiffs have alleged a plausible injury. Therefore, the Court addresses only the existence of a fiduciary duty.

To state a claim for breach of fiduciary duty, a plaintiff must establish "1) the existence of a fiduciary duty; 2) a breach of that duty; 3) and that the breach caused injury to the party to whom the duty was owed." *Seeger Enters., Inc. v. Town & Country Bank and Trust Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017) (citing *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky. 2013)). To support its claim, LMPOCU points to language from *Seeger*:

> A fiduciary duty is "the highest order of duty imposed by law." Such a duty "requires more than the generalized business obligation of good faith and fair dealing." In fact, it has been held that "*the relationship between a bank and a borrower does not ordinarily impose a fiduciary duty upon the bank.*" Rather, this relationship is one of creditor-debtor only. Only when a bank profits at the expense of its borrower has such a duty been held to exist.

*Id*. at 795 (citations omitted) (emphasis added). It argues that Plaintiffs fail to allege that it profited from Crowe's alleged wrongdoing and, as a result, fail to allege the existence of a fiduciary duty. DN 4-1 at 2. Plaintiffs respond that LMPOCU clearly profited and that, regardless, it owes a fiduciary duty to members because they are co-owners of LMPOCU. DN 5 at 17. The Court addresses both arguments in turn.

15

Under Kentucky law, a fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Only two Kentucky cases have found a fiduciary duty between a bank and its customers. *See Id. at* 485–86; *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 423–24 (Ky. Ct. App. 1978). Both focused on the existence of a confidential relationship from which the bank profited. In *Steelvest*, the bank used the confidential business plans of one borrower to help one of the borrower's competitors generate new business for the bank. 807 S.W.2d at 485–86. In *Henkin*, the bank usurped a corporate opportunity of one of its borrowers that the borrower revealed to the bank in confidence. 566 S.W.2d at 423–24. Here, Plaintiffs have not asserted that LMPOCU utilized any confidential information to its benefit and Plaintiffs detriment. As a result, they fail to state a claim on the first argument.

Turning to the second argument, Plaintiff argues that members are co-owners and, as a result, are owed a fiduciary duty.[3] DN 5 at 17–20. However, "plainly alleging co-ownership, by itself, is equally insufficient to support a finding of the existence of a fiduciary relationship." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 819 (E.D. Ky. 2013) (citing *Howell v. Bach*, 580 S.W.2d 711, 712 (Ky. Ct. App. 1978)). Only the confluence of co-ownership and management are sufficient to impose a fiduciary duty. *Id.* at 820.

---

[3] In the alternative, Plaintiffs allege that "the question whether a credit union owes a duty to its co-owners is a matter of first impression in Kentucky. Thus, the Court may determine that this legal question should be certified to the Kentucky Supreme Court under CR 76.37." DN 5 at 18, n. 68.

A credit union, by statute, allows "its members to use and control their own money on a democratic basis." KRS § 286.6-005(1). Members must have subscribed to shares in the company, KRS § 286.6-107, and are permitted to vote at annual and special meetings, KRS § 286.6-145. These seem to indicate an ownership interest of members in a credit union. However, management of the credit union is controlled by a Board of Directors and a Supervisory Committee. KRS § 286.6-155. The Board of Directors has "the general direction of the business affairs, funds, and records of the credit union." KRS § 286.6-215. *See also* KRS § 286.6-225 ("Specific duties of board.").

No Kentucky court appears to have ruled on this specific question. However, it is clear from the statutory scheme and the applicable Kentucky precedent surrounding the fiduciary duties owed by banks that members of a credit union lack sufficient managerial powers to be properly considered co-owners. Therefore, even as pled in the amended complaint, Plaintiffs have failed to allege a plausible claim based on breach of fiduciary duty.

### vi. Breach of Duty of Good Faith and Fair Dealing

LMPOCU argues that there is no legal basis for the tort of breach of the duty of good faith and fair dealing unless it arises out of an alleged breach of an insurance contract. DN 4-1 at 5 (citing *Walmac*, 941 F. Supp. 2d at 816). Plaintiffs do not dispute this point, but instead argue that their claim sounds in contract, rather than tort. DN 5 at 20.

"Every contract contains an implied covenant of good faith and fair dealing and thus 'impose[s] on the parties thereto a duty to do everything necessary to carry [out the contract].'" *Bank of America, N.A. v. Corporex Realty & Inv., LLC*, 875 F. Supp. 2d 689, 699 (E.D. Ky. 2012) (citing *de Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817, 823 (Ky. Ct. App. 2007)). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed

common purpose and consistency with the justified expectations of the other party." *Id.* at 699–700 (citing RESTATEMENT (SECOND) OF CONTRACTS, § 205 cmt. a (AM. LAW. INST. 1981)). Bad faith may consist of inaction, may be the "abuse of power to specify terms, [or] interference with or failure to cooperate in the other party's performance." *Id.* at 700 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 205 cmt. d (AM. LAW. INST. 1981)).

The Plaintiffs complaint repeatedly and expressly refers to contracts and agreements. DN 5 at 20–21. In the First Amendment Complaint's good faith and fair dealing count, the Plaintiffs specifically focus on the credit union agreement and electronic funds transfer agreement. DN 7-1 at 29. Taking the remaining factual allegations as true, it is plausible that the Defendants failed to comport with their duties to carry out those contracts, even potentially in bad faith. Therefore, the Plaintiffs have pled a plausible ground for relief.

### vii. Electronic Funds Transfer Act

The Electronic Funds Transfer Act, in pertinent part, provides that:

> a financial institution shall be liable to a consumer for all damages proximately caused by the financial institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, in the correct amount or in a timely manner when properly instructed to do so by the consumer, [with certain exceptions].

15 U.S.C. § 1693h(a)(1). LMPOCU alleges that it is not liable under the act because a safe harbor provision of the act provides that:

> A person has no liability under this section for any failure to comply with any requirement under this title if, prior to the institution of an action under this section, the person notifies the consumer concerned of the failure, complies with the requirements of this title, and makes an appropriate adjustment to the consumer's account and pays actual damages or, where applicable, damages in accordance with section 910.

15 U.S.C. § 1693m(e). *See* DN 4-1 at 8. LMPOCU alleges it falls within this safe harbor because it worked with Plaintiffs to "monitor and remedy, where necessary, any perceived inaccuracies in

18

Plaintiffs' banking accounts and records and credit history." *Id*. Plaintiffs counter that LMPOCU "took none of the steps required to avoid liability[,] . . . never notified the Plaintiffs of its failure to comply with the statute[,] . . . has not determined what electronic transfers were made, and should have been made[,] . . . [n]or has it adjusted Plaintiffs' accounts to reflect proper application of the electronic transfers that were made." DN 5 at 22. Instead, LMPOCU "refused to let them see records of their accounts because 'too many materials were missing.'" *Id.*

Taking Plaintiffs facts as true, LMPOCU failed to make electronic funds transfers in accordance with the account terms and conditions. Further, LMPOCU never notified the Plaintiffs of Crowe's alleged misconduct. The closest it came was the website message asking users to check their accounts because LMPOCU was conducting an audit. It also appears that LMPOCU has not adequately remedied the other issues stated by Plaintiffs throughout their complaint, as they all continue to experience financial issues arising from the actions and inactions of Defendants. Therefore, Plaintiffs state a claim for relief that is plausible on its face.

V. **Conclusion**

The Plaintiffs amended complaint would not result in improper joinder and would not be futile. Therefore, the Court, being sufficiently advised, **GRANTS** the Camposes motion to amend (DN 7).

Under that amended complaint, Plaintiffs have successfully stated a plausible claim on which relief can be granted for every count except count 1 (breach of fiduciary duty). Therefore, the Court, being sufficiently advised, **GRANTS IN PART AND DENIES IN PART** LMPOCU's motion to dismiss (DN 4).

       IT IS SO ORDERE

       **Charles R. Simpson III, Senior Judge**
       **United States District Court**

September 28, 2018